UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| MATTHEW J. HUTCHINSON, | Case No. 3:10-cv-00229-MMD-VPC |
| Petitioner, | ORDER |
| v. | |
| DIRECTOR, NEVADA DEPARTMENT OF CORRECTIONS, et al., | |
| Respondents. | |

This habeas matter comes before the Court for a final decision on the merits.

I.    **BACKGROUND**

Petitioner Matthew Hutchinson challenges his 2007 Nevada state conviction, pursuant to a guilty plea, of first-degree murder.  He is serving a life sentence without the possibility of parole.  Petitioner's untimely direct appeal was dismissed for lack of jurisdiction.  He thereafter challenged the conviction on state post-conviction review.

A.    **The Principal Factual Issue Presented**

The federal petition (dkt. no. 5) presents a single ground.  Petitioner alleges therein that he was denied effective assistance of counsel in violation of the Sixth Amendment because his counsel had a conflict of interest.  According to the petition, the public defender had a conflict of interest because the public defender previously represented Hutchinson's co-defendant from the murder case in unrelated juvenile proceedings.  Petitioner alleges that he would not have entered the guilty plea and would have gone to trial if he instead had been afforded allegedly conflict-free representation and advice.

**B.     The Charges and Evidence Against Petitioner Prior to his Guilty Plea**

Prior to his plea bargain, Matthew Hutchinson was charged in Pershing County along with Nickolas Andrews with first-degree murder with the use of a deadly weapon and burglary with the use of a deadly weapon in the shooting death of George Moritz on May 27, 2006.

The evidence presented at the preliminary hearing reflected that, if the matter had gone to trial, the State would have been able to present evidence tending to establish the following.[1]

On the evening of May 26, 2006, five friends went camping at Sonoma Canyon near Winnemucca, Nevada.   The five were Sean Callahan, his girlfriend Lacy Sholey, her friend Kelsey Sur, Oscar Mercado, and George Moritz.   The five were variously in their teens or early twenties.[2]

After eating and socializing around the campfire, the friends ultimately retired to a large family-size camping tent, talking a while before drifting off to sleep.[3]

At around 2:00 a.m., several of the campers were awoken variously at one point or another by the sound outside the tent of footsteps, male voices shouting, and/or kicking or punching on the tent.   Sean Callahan and Lacey Sholey, who both knew Matthew Hutchinson, recognized one of the two voices as Hutchinson's voice.   The two

---

[1]The Court makes no credibility findings or other factual findings regarding the truth or falsity of evidence or statements of fact in the state court. The Court summarizes these factual assertions solely as background to the issues presented in this case, and it does not summarize all such material.  No statement of fact made in describing statements, testimony or other evidence in the state court constitutes a finding by this Court. The alleged significance of additional specific evidence or categories of evidence referred to by petitioner in support of his claim is discussed in the discussion of his claim *infra*.  The present recital of the evidence constitutes only an overview for context. Any absence of mention of a specific piece of evidence or category of evidence in this overview does not signify that the Court has overlooked the evidence in considering petitioner's claim.

[2]Dkt. no. 11, Exh. 19B, at 79-82 (Callahan); *id.*, Exh. 19C, at 145-47 (Sur); *id.*, Exh. 19D, at 151-53 (same); *id.*, at 182-84 (Sholey).

[3]Dkt. no. 11, Exh. 19B, at 83-85 & 96-99 (Callahan); *id.*, Exh. 19C, at 147-48; (Sur); *id.*, Exh. 19D, at 184-85 (Sholey).

men outside the tent, *inter alia*, were calling for George Moritz to come out of the tent. Callahan testified that the second voice was saying that "you keep messing with my girl, dog" and/or "with my best friend's girl."[4]

Moritz, who appeared to be still asleep, did not respond. The men then forced their way into the tent by stepping through the closed door zipper, causing the zipper to separate.[5]

Both Callahan and Sholey recognized Matthew Hutchinson's face as the two men entered the tent and went from person to person looking for Moritz. The tent's interior was fairly well illuminated by light from a nearly full moon, and the campers had left a fire burning outside because it was cold and windy.[6]

Once they found where George Moritz was in the tent, Hutchinson and perhaps (depending on the witness) also the second man started beating Moritz about the head. Moritz woke up, tried to cover his head, and started asking who was beating him and why. At this point, Callahan heard Hutchinson say: "This is Matt, you're not taking my girl from me." Sholey heard Hutchinson say: "This is Matt, you stole Ashley, you stole Ashley, I'm here to get my revenge." Sur similarly heard one of the two men say: "This is Matt, stay away from my girlfriend," then referring to "Ashley" in response to Moritz' query. Both Hutchinson and Moritz had had a relationship with Ashley Brookins at one time or another.[7]

_____

[4]Dkt. no. 11, Exh. 19B, at 80, 85-86, 96 & 99 (Callahan); *id.*, Exh. 19C, at 100-02, 115-20 & 122-23 (same); *id.*, at 148 (Sur); dkt. no. 11, Exh. 19D, at 153-56 & 164-67 (same); *id.*, at 184-86 & 191-92 (Sholey); dkt. no. 11, Exh. 19E, at 200 & 205-06 (same).

[5]Dkt. no. 11, Exh. 19B, at 86 (Callahan); *id.*, Exh. 19C, at 103 (same); *id.*, at 148-49 (Sur); dkt. no. 11, Exh. 19D, at 156-57 (same); *id.*, at 186, 190 & 192-93 (Sholey).

[6]Dkt. no. 11, Exh. 19B, at 86 (Callahan); *id.*, Exh. 19C, at 100, 102-05 & 118 (same); *id.*, at 147 (Sur); dkt. no. 11, Exh. 19D, at 171 (same); *id.*, at 183, 186 & 189-91 (Sholey); dkt. no. 11, Exh. 19E, at 201-07 (same).

[7]Dkt. no. 11, Exh. 19B, at 86-87 (Callahan); *id.*, Exh. 19C, at 104-09 (same); *id.*, at 149 (Sur); dkt. no. 11, Exh. 19D, at 157-61, 163-64 & 167-70 (Sur); *id.*, at 187-88 & 193-95 (Sholey); dtk. no. 11, Exh. 19E, at 200-01 (same); *id.*, at 235 & 241-47 (Ashley Brookins).

Callahan saw that Hutchinson was beating Moritz with a blunt object, which he then recognized as a .22 caliber handgun when Hutchinson turned it around in his hand. Sholey also saw that Hutchinson was beating Moritz with a gun. Callahan and Sholey then heard a loud pop, "like a firecracker;" and Callahan, Sholey and Sur all saw a flash. Sholey testified that Hutchinson shot George Moritz "right in the head" at point blank range as Moritz tried to get up on his hands. Callahan, Sholey and Sur then heard the second man say a variation of: "Dude, you just shot him."[8]

The men then quickly ran out of the tent and left. Callahan followed them out to see Hutchinson's purple Camaro driving off. He noticed that the red plastic on one of the taillights had broken, such that the white light shone through.[9]

Callahan and the others then put Moritz in Callahan's car and drove to get medical attention for him. During the drive, they came up behind Hutchinson's vehicle again, before the two vehicles went different directions at an intersection. Callahan and Sholey recognized both the vehicle and Matthew Hutchinson inside.[10]

Apparently earlier that same morning, local police officers had been investigating a report of shots fired. This report at that time was not of an individual having been shot but instead was only of shots fired. An officer made a traffic stop of Hutchinson's vehicle, which fit the description that had been given and which also had a broken taillight. Hutchinson and Andrews were in the vehicle. In the course of the stop, another officer retrieved a K-frame, *i.e.* medium framed, Smith & Wesson revolver. The cylinder contained four live cartridges and two spent casings. The officer, the

---

[8]Dkt. no. 11, Exh. 19B, at 86-87 (Callahan); *id.*, Exh. 19C, at 104-09 & 115 (same); *id.*, at 149 (Sur); dkt. no. 11, Exh. 19D, at 150, 158-59 & 170-71 (same); *id.*, at 186-88, 193 & 195-96 (Sholey). The Court notes that a .22 caliber handgun, being in one of the smaller calibers made, would not necessarily have a loud report that would be noticed or recalled by all of the witnesses.

[9]Dkt. no. 11, Exh. 19B, at 87-91 (Callahan); *id.*, Exh. 19C, at 109-12 (same); dkt. no. 11, Exh. 19D, at 150 & 159 (Sur); *id.*, at 188 & 196-97 (Sholey).

[10]Dkt. no. 11, Exh. 19B at 91-92 (Callahan); *id.*, Exh. 19C at 112-14 (same); dkt. no. 11, Exh. 19D, at 150, 159 & 161-62 (Sur); *id.*, at 188 & 197-99 (Sholey).

1    department range master, did not detect a residual odor that would indicate that the

2    weapon recently had been fired.  He acknowledged, however, that it was possible that

3    he had been mistaken.  He returned the weapon and the two men were allowed to

4    proceed on their way, apparently before Moritz was shot.[11]

5        Later in the early morning hours, Matt Hutchinson called Randy Brookins, Ashley

6    Brookins' father.  Hutchinson worked with the elder Brookins and had been renting a

7    room from him for about a month.  Hutchinson told Brookins that he "had done

8    something really bad," and he asked him to tell the police if they inquired that he had

9    been home all night.[12]

10        Hutchinson subsequently called Ashley Brookins on her cell phone. He ultimately

11    told her that he had shot George Moritz.  When she then met with him, he told her again

12    that he had shot Moritz and that he had "ditched" his car because the police were

13    looking for it.[13]

14    ///

15    ///

16

17        [11]Dkt. no. 11, Exh. 19C, at 130-41.  The transcript reads "key-frame Smith & Wesson revolver," but in context the officer more likely would have been referring to a

18    "K-frame," reflecting the standard designation for a medium frame Smith & Wesson revolver.

19

20        [12]Dkt. no. 11, Exh. 19E, at 208-09 & 215.  Brookins had told Hutchinson before he moved in that his sixteen-year-old daughter was "off limits."  Brookins had had to kick

21    Hutchinson out of his daughter's room when he found him sleeping on the floor of her room.  He professed, however, to having been and being unaware of a relationship between the two. See id., at 216-17, 226-28 & 230; see also id., at 232 & 242-44

22    (related testimony by Ashley Brookins).

     Randy Brookins testified that a caller purporting to be Nick Andrews also called a

23    few minutes later and requested that he say that Hutchinson had been at home all night. Dkt. no. 11, Exh. 19E, at 209-210.  A friend of Andrews further testified that he called

24    her early that morning requesting a ride and making statements inculpating both Hutchinson and himself to one degree or another: Id., Exh. 19D, at 174-82 (Amy

25    McLinden).  The Court has assumed that statements by Andrews at these points subsequent to the offense would not have been admissible at a trial as against

26    Hutchinson.  As reflected by the discussion in the text, there was substantial inculpatory evidence against Hutchinson without regard to such post-incident statements by

27    Andrews.

28        [13]Dkt. no. 11, Exh. 19E, at 238-40 (Ashley Brookins).

1       Ashley Brookins went to the hospital to see about Moritz.  While there, she called

2   back home to her father to tell him that Hutchinson had killed Moritz and to tell him to be

3   careful with Hutchinson in the house.  (Dkt. no. 11, Exh. 19E, at 210-11 & 240.)

4       Randy Brookins loaded his 12 gauge shotgun, went to the back of the house,

5   and asked Hutchinson what had happened earlier that morning, telling him that George

6   Moritz was dead.  Hutchinson ultimately told Brookins he went to "teach Moritz a lesson"

7   after he heard that Moritz was disrespecting him around town.  He said that he had

8   done a "drive-by shooting" on the way and had been stopped briefly by the police.

9   According to Hutchinson, Andrews was pistol-whipping Moritz and the gun went off.[14]

10       The police ultimately apprehended Hutchinson and Andrews a second time later

11   that morning.  Sean Callahan identified Nickolas Andrews' voice as the voice of the

12   second man, in essentially a vocal one-person showup.[15]  The police questioned both

13   Hutchinson and Andrews.

14       Hutchinson gave a shifting and not wholly consistent account of what had

15   happened earlier at the campsite.  His account ultimately tracked the basic contours of

16   the eyewitness accounts by Callahan, Sholey and Sur.  However, in Hutchinson's

17   account, it instead was Nickolas Andrews who was angry at Moritz for being involved

18   with a girlfriend of his, and it instead was Andrews who had the gun and shot Moritz

19   while pistol-whipping him.  Hutchinson ultimately also told the police that they had put

20   the gun, some ammunition and their shoes in a white trash bag with red drawstrings and

21   hid it near the railroad tracks behind the back gate at Andrews' residence.[16]

---

23   [14]Dkt. no. 11, Exh. 19E, at 211-14, 218-19 & 221.  Hutchinson perhaps might

24   have thought it to be not advisable to tell the father with a loaded 12-gauge shotgun that he went after Moritz because he allegedly was involved with Hutchinson's sixteen year-old girlfriend, Ashley Brookins.

25   [15]Dkt. no. 11, Exh. 19B, at 92-96; id., Exh. 19C, at 123-26.

26   [16]Dkt. no. 11, Exh. 19A, at 19-32 & 35-49 (Detective Rick Brown); id., Exh. 19B,

27   at 50-53 (same). Nickolas Andrews' account was more consistent with the accounts given by the eyewitnesses. See id., at 55-79 (Detective Mary Haugen). The Court

28   assumes that such interview statements by Andrews, if otherwise admissible against (...fn. cont.)

1    Law officers searched the area near the railroad tracks behind Andrews'
2    residence to which Hutchinson had referred. They found a white trash bag with red
3    drawstrings containing a revolver, ammunition, and two pairs of shoes.[17]

4    At the scene of the shooting, investigating officers found, *inter alia*, a large
5    quantity of blood in the disheveled tent, which had been pooling also outside the tent
6    after leaking through a hole in the floor.  Officers then found a metal-jacketed fired bullet
7    on the ground corresponding to the location of the hole in the tent floor.[18]

8    The forensic pathologist that performed the autopsy observed a gunshot
9    entrance wound on the left side of George Moritz' head and an exit wound on the right
10   side of his head. She opined that Moritz died from a single gunshot wound to the
11   head.[19]

12   ///

13

_____

14   (fn. cont...)
     Andrews given his challenge to admission of the statements, would not have been
15   admissible at trial against Hutchinson.

16   [17]Dkt. no. 11, Exh. 19D, at 172-73.

17   [18]Dkt. no. 11, Exh. 19A, at 19.

18   [19]*Id.*, at 7-14.  The State did not present further firearm, fingerprint, autopsy, or
     other forensic expert evidence at the preliminary hearing as it might have done at trial.
19   The State would have had no occasion to present such evidence at the preliminary
     hearing because the State had only a slight burden of proof at that proceeding.  The
20   State in fact subsequently gave notice of its intent to call and did subpoena for trial
     forensic expert witnesses as to, *inter alia*, fingerprints, crime scene investigation,
21   serology, DNA evidence, shoe prints, autopsy evidence, gunshot residue, firearms, and
     ballistics.  See dkt. no. 11, Exhs. 23 & 25.
22   Given the unequivocal eyewitness testimony by witnesses who knew petitioner
     personally, Hutchinson faced substantial direct evidence that he shot and killed George
23   Moritz even without evidence, *e.g.,* confirming that the bullet recovered from the scene
     matched the gun recovered and/or with Matthew Hutchinson's fingerprints on the
24   weapon in firing position and/or with corresponding trace evidence of Moritz' blood on
     the bullet and/or consistent metal fragments in his body.  The defense no doubt would
25   have sought to challenge the credibility or reliability of the multiple prosecution
     witnesses on one basis or another. However — in the context of considering objectively
26   what a reasonable defendant would have done in Hutchinson's situation in weighing a
     possible plea deal — Hutchinson nonetheless faced a fairly substantial body of State
27   evidence that tended to directly establish that he attacked a theretofore sleeping
     George Moritz without legally justifiable provocation and killed him by shooting him
28   through the head.

7

1   **C.     Representation of Co-Defendant in Juvenile Proceedings**

2      In the murder case, the Nevada State Public Defender's Office was appointed to

3   represent Matthew Hutchinson at his June 1, 2006, arraignment in the justice court.

4   Deputy public defender Carl Anderson undertook representation at that time.  Anderson

5   represented Hutchinson through the entirety of the criminal proceedings in the justice

6   court and state district court, culminating in the judgment of conviction on the guilty plea

7   filed on January 25, 2007.[20]

8      The public defender's office also represented Hutchinson's co-defendant,

9   Nickolas Andrews, in prior juvenile proceedings, in neighboring Humboldt County.

10      The Court will refer to the co-defendant's juvenile proceedings in conclusory

11   terms herein in order to preserve the confidentiality of those proceedings.  The Court

12   will refer to the most pertinent pages of the sealed materials on file in this matter as

13   support for the characterization of the proceedings made herein.

14      It suffices to say for this matter that the incidents alleged in the juvenile

15   proceedings were comparatively minor offenses, were wholly unrelated to the murder

16   prosecution, and would involve no confidences conceivably or remotely related to the

17   adult prosecution.[21]

18      The first charged incident allegedly occurred on January 16, 2004, and the

19   charges were brought on January 27, 2004, more than two years prior to the murder of

20   Moritz.  It appears that this charge was handled at least preliminarily without counsel

21   being appointed but with a parent's involvement.[22]

22

---

23   [20]Dkt. no. 11, Exhs. 9, 10 & 36.  The appellate division of the public defender's
    office represented Hutchinson thereafter in connection with an untimely direct appeal
24   that was dismissed. Petitioner's claim, however, is that he was denied effective
    assistance of counsel because he allegedly did not have conflict-free counsel when he
25   entered the guilty plea.  The pertinent focus herein therefore is on the representation up
    through the plea.
26
    [21]Dkt. no. 29, Exh. 70A, at electronic docketing page 22; *id.*, Exh. 70B, at
27   electronic docketing pages 8 & 14.
    [22]Dkt. no. 29, Exh. 70B, at electronic docketing pages 11-16.
28

8

The next charged incidents allegedly occurred on February 18, 2004, and March 8, 2004, also more than two years prior to the murder.  The charges were brought on April 19, 2004.  The Nevada State Public Defender's Office was appointed to represent Andrews on April 23, 2004.  Apparently retained counsel substituted in for Andrews, however, on September 27, 2004, with Andrew Myers signing for the public defender's office.[23]

The final charged incident allegedly occurred on March 8, 2006, nearly three months prior to the murder of Moritz.  The charge was brought on March 22, 2006, and the Nevada State Public Defender's Office was appointed to represent Andrews at that time.  The matter was adjudicated by an order filed on May 3, 2006, nearly a month prior to the murder, with deputy public defender Steve McGuire representing Andrews.  Thereafter, by a stipulation and order submitted on June 20, 2006, and filed on June 29, 2006, Bob Dolan, who represented Andrews in the murder prosecution, was substituted as counsel for the Nevada State Public Defender's Office in the juvenile proceeding. McGuire signed for the public defender over a Winnemucca field office address.[24]

From the record presented, it appears that by the time of Hutchinson's December 12, 2006, guilty plea in the murder case, all such juvenile proceedings against his co-defendant had been adjudicated, some long since adjudicated, and the public defender also no longer was counsel of record for Andrews in the proceedings.

**D.    Guilty Plea and Sentencing**

Prior to his guilty plea, Hutchinson faced a minimum exposure on the charge of murder with a dangerous weapon if convicted of 20 to 50 years with a like consecutive

---

[23]Dkt. no. 29, Exh. 70B, at electronic docketing pages 4-10.

[24]Dkt. no. 29, Exh. 70A, at electronic docketing pages 4, 6 & 20-22.  Petitioner urges that the May 1, 2006, order did not constitute a final disposition because it directed that Andrews remain on formal probation until further order of the court. However, the fact that Andrews remained subject to juvenile probation supervision until released from such supervision did not signify that the court had not adjudicated the charges presented.  The outcome on federal habeas review in any event does not turn on the point, as discussed further, *infra.*

sentence of 20 to 50 years.  He faced a maximum possible sentence on that charge of two consecutive life sentences without the possibility of parole.  The State had declared that it would not be seeking the death penalty.  He faced a potential exposure on the charge of burglary with the use of a deadly weapon of 2 to 15 years, which potentially could be imposed consecutively to any sentence on the murder charge and weapon enhancement.  Neither charge was probationable.[25]

Pursuant to the December 12, 2006, guilty plea agreement and plea colloquy, Hutchinson pled guilty to first-degree murder with no weapon enhancement in exchange for the State: (a) dismissing the charge of burglary with a deadly weapon; (b) not filing charges in a drive-by shooting in a neighboring county; and (c) concurring with the sentencing recommendation of the Department of Parole and Probation once made.  No agreement was made in the plea bargain cabining Hutchinson's potential sentencing exposure on the murder charge, such that he faced a non-probationable minimum of 20 to 50 years and a maximum of life without the possibility of parole on that particular charge.  Hutchinson acknowledged both that he had not been promised or guaranteed any particular sentence and that the Court would not be bound by the parties' sentencing recommendation.  Hutchinson further acknowledged that he was satisfied with the services of his counsel, he was not aware of anything that counsel could have done more or better in representing him, and he could not think of anything that counsel should have done differently that would have changed his mind with regard to pleading guilty.  Hutchinson also expressly admitted the facts underlying the murder charge, in an extensive unequivocal recital that corresponded to the eyewitness accounts and in which he admitted, *inter alia*, pulling the trigger and shooting Moritz.[26]

---

[25]Dkt. no. 11, Exh. 19A, at 6; *id.*, Exh. 22, at 6-7.

[26]Dkt. no. 12, Exh. 28 (guilty plea agreement); *id.*, Exh. 29, at 2-4, 7-12 & 14-15 (colloquy).  The Court would note that the plea colloquy conducted by the state district court judge in this case was exceedingly thorough.  The plea colloquy was a veritable model of how a colloquy should be conducted to ensure that a guilty plea was accepted only upon a record clearly demonstrating that the defendant had knowingly, intelligently and voluntarily entered a guilty plea.

The matter came on for sentencing on January 12, 2007.  Hutchinson again expressly affirmed on the record at the start of the proceeding that he was satisfied with his counsel's representation through that time.  Parole and Probation recommended a life sentence with the possibility of parole after 20 years. The extensive sentencing proceeding included testimony that Andrews had stated to investigating officers that Hutchinson had said to him during the drive away from the campsite after shooting Moritz that they should go back and kill the witnesses. Following the extensive proceeding, the state district court sentenced Hutchinson, who was an adult when he killed Moritz, to life without the possibility of parole.[27]

### E.    Pertinent State Post-Conviction Proceedings

On state post-conviction review, the state district court appointed counsel for petitioner and held an evidentiary hearing on, *inter alia*, his claim that he had been denied effective assistance of counsel due to an alleged conflict of interest.

Petitioner presented testimony by attorney James Logan, who testified as follows.[28]

Logan was the chief appellate deputy defender with the Nevada State Public Defender's Office. With regard to the untimely appeal, he testified that when he discovered that an appeal had not been filed, he assigned the matter to himself.  He thereafter pursued the untimely appeal in order to make a record as to what had transpired with the appeal not being pursued timely by the public defender's appellate division.[29]

---

[27]Dkt. no. 12, Exh. 31A at 5-6 & 7-9; *id.*, Exh. 31B, at 66-74.

[28]See note 1, *supra*.

[29]Dkt. no. 27, Exh. 70, at 10-13.  The Court notes, however, that the record reflects that the notice of appeal initially was filed by another attorney out of the Winnemucca office.  Logan later filed a response to the state supreme court's show-cause order, from his Carson City office.  Dkt. no. 12, Exhs. 38 & 44.  To frame the discussion of Logan's testimony that follows, the Court takes judicial notice that Carson City is nearly 200 miles to the southwest of Winnemucca, approximately a three-hour drive away.  Lovelock, where Hutchinson's case was prosecuted in Pershing County, is between the two cities, nearly 75 miles southwest of Winnemucca.

1    Logan further testified that he recalled overhearing discussions at his office, in

2  which he was not involved, regarding a potential conflict due to representation of

3  Andrews in prior juvenile proceedings. He could not state when he overheard the

4  discussions, but he testified, "I knew that there was a problem [due to the representation

5  in the juvenile proceedings] and it was early on when the case was being handled."

6  Logan had only a vague recollection of the particulars, and his testimony as to the basis

7  for the alleged conflict was generalized.  He recalled that "some people were upset

8  about it." Logan thought that Steve McGuire and Aziz Merchant had been trial

9  counsel.[30]

10    Logan had no awareness that it instead was Carl Anderson who had handled

11  Hutchinson's case from the initial appointment at the June 1, 2006, arraignment in the

12  justice court through the January 12, 2007, sentencing.  Logan, who worked in Carson

13  City hours away from Lovelock and Winnemucca, had never even met Anderson.  He

14  did not recall having any conversations with Anderson – the actual trial counsel –

15  regarding the case, at any time.  His own discussions about the case with McGuire and

16  Merchant were after the fact, when he was investigating why an appeal had not been

17  filed timely.  He testified on redirect that the discussions that he heard were in Carson

18  City, not in Lovelock or Winnemucca.  He affirmed on redirect only that it was "at least .

19  . . [his] understanding that, at some point in time during [the] case, there was a concern

20  about this potential conflict of interest."[31]

21    The Nevada State Public Defender's Office did not have a conflict avoidance

22  computer program that covered all of its offices. The program on the computer in

23  Carson City – where Logan worked – covered only Storey and Carson Counties; and

24  Logan testified that, "I don't think it works very well, but it tries."  There was no such

25  computer program for the "outlying counties," such as Pershing County where

26

27    [30]Dkt. no. 27, Exh. 70, at 13-19, 21-22 & 24-27.

28    [31]Id., at 19, 21-22 & 26-27.

Hutchinson's case was prosecuted and Humboldt County where Andrews' juvenile proceedings arose.  Out in the field offices, the only conflict avoidance system was the memory of the lawyers and the secretary.  Logan acknowledged that "it would always just depend on whether they both knew that – the two attorneys or the secretary knew that there was a co-defendant involved."  He further acknowledged that "it's fair to say that those kind of conflicts could slip by pretty easily."[32]

No evidence was presented at the state post-conviction evidentiary hearing that Carl Anderson ever was aware during his defense of the Pershing County murder case against Hutchinson in Lovelock that his co-defendant Andrews had been represented by lawyers in the public defender's Winnemucca office in unrelated juvenile proceedings in Humboldt County.

No evidence was presented at the evidentiary hearing that Hutchinson sustained any actual prejudice as a result of the alleged potential conflict of interest, of which his defense counsel may not even have been aware.  Post-conviction counsel argued that prejudice could be presumed from "this divided loyalty situation," but counsel acknowledged that he did not have any case law supporting such an argument of presumed prejudice.[33]

The state district court held, first, that defense counsel's performance was not deficient because the murder case and juvenile matters were not "substantially related matters" for purposes of the conflict rule in Rule 1.9 of the Rules of Professional Conduct.  The court held, second, that, even if deficient performance were assumed for the sake of argument, petitioner had failed to demonstrate resulting prejudice.[34]

The state supreme court's decision on the claim on the state post-conviction appeal is discussed, *infra*.

---

[32]*Id.*, at 22-24 & 25-26.

[33]Dkt. no. 27, Exh. 70, at 33-34.

[34]Dkt. no. 13, Exh. 54, at 4-5 & 7-10; dkt. no. 27, Exh. 70, at 41-42.

## II.   GOVERNING LAW

The Antiterrorism and Effective Death Penalty Act (AEDPA) imposes a "highly deferential" standard for evaluating state-court rulings on the merits that is "difficult to meet" and "which demands that state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 131 S.Ct. 1388, 1398 (2011). Under this highly deferential standard of review, a federal court may not grant habeas relief merely because it might conclude that the state court decision was incorrect.  131 S.Ct. at 1411.  Instead, under 28 U.S.C. § 2254(d), the court may grant relief only if the state court decision: (1) was either contrary to or involved an unreasonable application of clearly established law as determined by the United States Supreme Court; or (2) was based on an unreasonable determination of the facts in light of the evidence presented at the state court proceeding.  131 S.Ct. at 1398-1401.

A state court decision is "contrary to" law clearly established by the Supreme Court only if it applies a rule that contradicts the governing law set forth in Supreme Court case law or if the decision confronts a set of facts that are materially indistinguishable from a Supreme Court decision and nevertheless arrives at a different result.  *E.g., Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003).  A state court decision is not contrary to established federal law merely because it does not cite the Supreme Court's opinions.  *Id.*  Indeed, the Supreme Court has held that a state court need not even be aware of its precedents, so long as neither the reasoning nor the result of its decision contradicts them.  *Id.*  Moreover, "[a] federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme] Court is, at best, ambiguous."  540 U.S. at 16.  For, at bottom, a decision that does not conflict with the reasoning or holdings of Supreme Court precedent is not contrary to clearly established federal law.

A state court decision constitutes an "unreasonable application" of clearly established federal law only if it is demonstrated that the state court's application of Supreme Court precedent to the facts of the case was not only incorrect but "objectively

14

1  unreasonable." *E.g., Mitchell*, 540 U.S. at 18; *Davis v. Woodford*, 384 F.3d 628, 638 (9[th]

2  Cir. 2004).

3        To the extent that the state court's factual findings are challenged, the

4  "unreasonable determination of fact" clause of Section 2254(d)(2) controls on federal

5  habeas review. *E.g., Lambert v. Blodgett*, 393 F.3d 943, 972 (9th Cir. 2004). This clause

6  requires that the federal courts "must be particularly deferential" to state court factual

7  determinations. *Id.* The governing standard is not satisfied by a showing merely that

8  the state court finding was "clearly erroneous." 393 F.3d at 973. Rather, AEDPA

9  requires substantially more deference:

10     . . . . [I]n concluding that a state-court finding is unsupported by
   substantial evidence in the state-court record, it is not enough that we

11 would reverse in similar circumstances if this were an appeal from a
   district court decision. Rather, we must be convinced that an appellate

12 panel, applying the normal standards of appellate review, could not
   reasonably conclude that the finding is supported by the record.

13

14 *Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004); *see also Lambert*, 393 F.3d at

15 972.

16       Under 28 U.S.C. § 2254(e)(1), state court factual findings are presumed to be

17 correct unless rebutted by clear and convincing evidence.

18       The decisions in *Tollett v. Henderson*, 411 U.S. 258 (1973), and *Hill v. Lockhart*,

19 474 U.S. 52 (1985), sharply curtail the possible grounds available for challenging a

20 conviction entered following a guilty plea. As the court stated in *Tollett*:

21     . . . . [A] guilty plea represents a break in the chain of events which
   has preceded it in the criminal process. When a criminal defendant has

22 solemnly admitted in open court that he is in fact guilty of the offense with
   which he is charged, he may not thereafter raise independent claims

23 relating to the deprivation of constitutional rights that occurred prior to the
   entry of the guilty plea. He may only attack the voluntary and intelligent

24 character of the guilty plea by showing that the advice he received from
   counsel was not within the [constitutional] standards [established for

25 effective assistance of counsel.]

26 411 U.S. at 267. Accordingly, "while claims of prior constitutional deprivation may play

27 a part in evaluating the advice rendered by counsel, they are not themselves

28 independent grounds for federal collateral relief." *Id.*

In *Hill*, the court held that the two-pronged test of *Strickland v. Washington*, 466 U.S. 668 (1984), applies to challenges to guilty pleas based on alleged ineffective assistance of counsel. 474 U.S. at 58. Accordingly, a petitioner seeking to set aside a guilty plea due to ineffective assistance of counsel must demonstrate: (1) that his counsel's performance fell below an objective standard of reasonableness; and (2) that the defective performance resulted in actual prejudice. 474 U.S. at 58-59.

On the performance prong, the question is not what counsel might have done differently but rather is whether counsel's decisions were reasonable from counsel's perspective at the time. In this regard, the reviewing court starts from a strong presumption that counsel's conduct fell within the wide range of reasonable conduct. *E.g., Beardslee v. Woodford*, 327 F.3d 799, 807-08 (9th Cir. 2003).

On the prejudice prong, as a general matter under *Strickland*, the petitioner must demonstrate a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *E.g., Beardslee*, 327 F.3d at 807-08. Application of this general principle to the specific context of a guilty plea leads to the requirement that the petitioner "must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill*, 474 U.S. at 59.

Under *Hill*, a challenge to the voluntariness of a guilty plea may be based upon a claim of ineffective assistance of counsel in proceedings prior to the plea. As the court observed:

> . . . . For example, where the alleged error of counsel is a failure to investigate or discover potentially exculpatory evidence, the determination whether the error "prejudiced" the defendant by causing him to plead guilty rather than go to trial will depend on the likelihood that discovery of the evidence would have led counsel to change his recommendation as to the plea. This assessment, in turn, will depend in large part on a prediction whether the evidence likely would have changed the outcome of a trial. Similarly, where the alleged error of counsel is a failure to advise the defendant of a potential affirmative defense to the crime charged, the resolution of the "prejudice" inquiry will depend largely on whether the affirmative defense likely would have succeeded at trial. . . . As we explained in *Strickland v. Washington, supra*, these predictions of the outcome at a possible trial, where necessary, should be made objectively,

without regard for the "idiosyncrasies of the particular decisionmaker." Id., 466 U.S., at 695, 104 S.Ct., at 2068.474 U.S. at 59-60. Thus, an attorney's unprofessional error in, for example, failing to develop a meritorious defense may serve as a basis for overturning a guilty plea and conviction if, viewed objectively, there is a reasonable probability that, but for the error, the petitioner would not have pled guilty and would have insisted on going to trial.

While surmounting Strickland's high bar is "never an easy task," federal habeas review is "doubly deferential" in a case governed by the AEDPA.  In such cases, the reviewing court must take a "highly deferential" look at counsel's performance through the also "highly deferential" lens of § 2254(d).  Pinholster, 131 S.Ct. at 1403 & 1410.

The petitioner bears the burden of proving by a preponderance of the evidence that he is entitled to habeas relief. Pinholster, 131 S.Ct. at 1398.

III.   DISCUSSION

In the single ground presented, petitioner alleges that he was denied effective assistance of counsel in violation of the Sixth Amendment because the public defender allegedly had a conflict of interest due to the representation of his co-defendant in the juvenile proceedings.  He acknowledges in the federal petition that the co-defendant's juvenile offenses were "entirely unrelated to the crime of murder"[35] with which petitioner was charged.  He maintains, however, that he would not have entered the guilty plea and instead would have gone to trial if he had been afforded allegedly conflict-free representation and advice.

The Supreme Court of Nevada rejected the claim presented to that court on the following grounds in its March 10, 2010, decision:

Appellant argues that his trial counsel was ineffective because the public defender's office had a conflict of interest in representing him as the office represented the codefendant in an unrelated juvenile court matter. Appellant also argues that the conflict of interest caused the public defender's office to violate RPC 1.7 and 1.9.

Appellant fails to demonstrate that trial counsel's performance was deficient in that it fell below an objective standard of reasonableness, and fails to demonstrate resulting prejudice such that there is a reasonable probability that, but for counsel's errors, petitioner would not have pleaded

[35]Dkt. no. 5, at 3.

17

1   guilty and would have insisted on going to trial. *Hill v. Lockhart*, 474 U.S.
2   52, 58-59 (1985); *Kirksey v. State*, 112 Nev. 980, 988, 923 P.2d 1102, 1107 (1996).  Both components of the inquiry must be shown.  *Strickland v. Washington*, 466 U.S. 668, 697 (1984).
3
4   First, appellant fails to demonstrate that an actual conflict of interest existed.  *Strickland*, 466 U.S. at 692 (cited *Cuyler v. Sullivan*, 446 U.S.
5   335, 348, 350 (1980)).  Appellant fails to demonstrate that the brief time frame in which the public defender's office represented both him for the
6   murder charge and his codefendant for an unrelated juvenile court matter adversely affected his counsel's performance or created a situation
7   conducive to divided loyalties. *Id.*; *see also Clark v. State*, 108 Nev. 324, 326, 831 P.2d 1374, 1376 (1992).
8   Second, appellant fails to demonstrate a reasonable probability that
9   he would not have pleaded guilty and would have insisted on going to trial given that he admitted to the murder and the State agreed to the following
10  in exchange for a guilty plea: withdraw the deadly weapon enhancement, forgo seeking charges related to a drive-by shooting, and concur with the
11  sentencing recommendation made by probation and parole. Therefore, appellant fails to demonstrate that he was prejudiced by a conflict of interest or due to any violation of RPC 1.7 or RPC 1.9.
12
13  The district court determined that appellant's trial counsel was not ineffective and substantial evidence supports that determination.  *Riley v.*
14  *State*, 110 Nev. 638, 647, 878 P.2d 272, 278 (1994) (noting that a district court's factual findings regarding a claim of ineffective assistance of
15  counsel are entitled to deference when reviewed on appeal).  Therefore, the district court did not err in denying the petition.

16  Dkt. no. 13, Exh. 66, at 1-2.

17  The state supreme court's rejection of the Sixth Amendment claim was neither

18  contrary to nor an unreasonable application of clearly established federal law.

19  The Supreme Court of Nevada made no holding that defense counsel violated

20  any provision of the Nevada Rules of Professional Conduct.  Any holding made by the

21  court of course would be the final word on what is exclusively a state law issue,

22  because the Supreme Court of Nevada is the final arbiter of Nevada state law.  As the

23  matter stands, the state supreme court made no holding that counsel violated state

24  ethical standards.

25  Even if the state supreme court had held that defense counsel violated state

26  ethical standards, which it did not, a breach of a state ethical standard does not

27  establish a denial of effective assistance of counsel under the Sixth Amendment.  As

28  the United States Supreme Court observed in *Mickens v. Taylor*, 535 U.S. 162 (2002),

the purpose of the Court's prior decisions on the issue "is not to enforce the Canons of Legal Ethics, but to apply needed prophylaxis in situations where *Strickland* itself is evidently inadequate to assure vindication of the defendant's Sixth Amendment right to counsel." 535 U.S. at 176. Accordingly, "'breach of an ethical standard does not necessarily make out a denial of the Sixth Amendment guarantee of assistance of counsel.'" *Id.* (quoting *Nix v. Whiteside*, 475 U.S. 157, 165 (1986).

Rather, "[a]n 'actual conflict' for Sixth Amendment purposes, is a conflict of interest that adversely affects counsel's performance." *Mickens*, 535 U.S. at 172 n.5. Accordingly, "the rule applied when the trial judge is not aware of the conflict[36] (and thus not obligated to inquire) is that prejudice will be presumed only if the conflict has significantly affected counsel's performance — thereby rendering the [outcome] unreliable, even though *Strickland* prejudice cannot be shown." 535 U.S. at 173. A defendant or petitioner thus may not demonstrate a Sixth Amendment violation by identifying an alleged theoretical conflict of interest in the abstract. He instead must demonstrate "a division of loyalties *that affected counsel's performance*." 535 U.S. at 172 n.5 (emphasis in original). Such a division of loyalties might be shown, for example, where counsel failed to rigorously cross-examine a State witness in representing one defendant because he desired to protect the interests of another defendant. *See id.*

Moreover, the presence of an alleged multiple representation to which no objection was made at the time, standing alone, does not establish a Sixth Amendment actual conflict. *Mickens*, 535 U.S. at 168-69. That is, a defendant or petitioner may not establish a Sixth Amendment violation simply by identifying the presence of a prior alleged multiple representation to which no objection was made, on a premise that the

---

[36]No evidence was presented to the state courts that the judge in the murder trial was aware of the alleged conflict. The district judge who signed the juvenile court order was a different district judge. *Compare* dkt. no. 29, Exh. 70A, at electronic docketing page 6 (order in juvenile case) with dkt. no. 12, Exh. 36 (judgment in criminal case). Juvenile proceedings in Nevada are confidential. *Cf. Mickens*, 456 U.S. at 164-65 (noting that the same judge had been involved in the juvenile and adult criminal proceedings, such that confidentiality rules had not been a factor).

1   mere fact of the prior alleged multiple representation establishes in and of itself that

2   counsel had divided loyalties.  He instead must demonstrate an actual — as opposed to

3   theoretical — division of loyalties that adversely affected counsel's performance. As

4   clearly stated in *Mickens*, "'an actual conflict of interest mean[s] precisely a conflict *that*

5   *affected counsel's performance — as opposed to a mere theoretical division of loyalties.*"

6   535 U.S. at 171 (first emphasis in original). The defendant or petitioner, again, must

7   show "'that a conflict of interest *actually affected the adequacy of his representation.*'"

8   *Id.* (quoting prior authority; emphasis in *Mickens*).

9        In state court, Hutchinson made no showing at the evidentiary hearing that an

10   alleged conflict actually adversely affected counsel's performance, as opposed to

11   presenting a theoretical division of loyalties.  Petitioner instead expressly relied upon a

12   presumption of prejudice purportedly arising from the alleged multiple representation

13   itself, while acknowledging that there was no supporting authority.  Petitioner argued

14   that prejudice could be presumed from "this divided loyalty situation," *i.e*, a mere

15   theoretical division of loyalties as to an alleged conflict as to which counsel may not

16   have even been aware.[37]

17        *Mickens* quite clearly rejects the proposition that prejudice is to be automatically

18   presumed from an alleged conflict based upon multiple representation without a

19   showing that the alleged conflict actually — not theoretically — adversely affected the

20   adequacy of the representation. *E.g.,* 535 U.S. at 168-69.  The state supreme court's

21   rejection of the claim presented to that court accordingly was neither contrary to nor an

22   unreasonable application of clearly established federal law as determined by the United

23   States Supreme Court.[38]

---

24      [37]See text and record cites, *supra*, at 13.

25      [38]The Court's discussion in the text proceeds on an operating assumption that

26   the representation in the juvenile matter and the murder case was concurrent representation at least in part.  A strong argument could be made, however, that the representation by the two different public defenders in the unrelated matters in

27   substance was successive rather than concurrent.  While petitioner argues that the juvenile proceeding had not concluded, the record instead reflects that the juvenile case

28   (...fn. cont.)

1   On federal habeas review, petitioner urges that the testimony of the appellate

2   division public defender, James Logan, establishes both that a conflict of interest

3   existed and that the public defender was aware of the conflict.  As discussed *supra*,

4   Logan's testimony was equivocal and ambiguous not only as to what was said to whom

5   in conversations in which he was not directly involved, but also as to the exact basis for

6   the purported conflict over and above the mere fact of the multiple representation.  In all

7   events, the testimony of an attorney as to what he believes should be done in a

8   situation under state ethics rules defines neither the state ethical standard nor most

9   certainly the Sixth Amendment actual conflict standard.  Nothing in Logan's testimony

10   established that any such alleged theoretical conflict actually adversely affected the

11   adequacy of the actual trial counsel's representation, which is the showing that

12   petitioner must make under the Sixth Amendment.[39]

13   Petitioner further urges on federal habeas review that he has demonstrated that

14   an alleged conflict actually adversely affected the adequacy of counsel's performance

15   because an attorney with undivided loyalty allegedly would never have agreed to the

16   ///

17

18   *(fn. cont...)*
had been adjudicated prior to the representation in the murder case. *See* text and
19   record cites, *supra*, at 9 n.24.  If the matters properly are regarded as successive rather
than concurrent matters, it becomes pertinent that the *Mickens* Court expressly left
20   open the question of whether the rule applied therein also applied to successive
representation.  *See* 545 U.S. at 176 ("In resolving this case on the grounds on which it
21   was presented to us, we do not rule upon the need for the *Sullivan* prophylaxis in cases
of successive representation. Whether *Sullivan* should be extended to such cases
22   remains, as far as the jurisprudence of this Court is concerned, an open question.").
When the Supreme Court expressly leaves a question open, a state court decision
23   applying general Supreme Court precedent in the unresolved context by definition does
not constitute an objectively unreasonable application of clearly established federal law.
24   *See, e.g., Alberni v. McDaniel*, 458 F.3d 860, 866 (9th Cir. 2006).  As noted in the factual
background, however, the outcome on federal habeas review does not turn on this
25   point. Petitioner failed to show that the alleged conflict actually, rather than theoretically,
adversely affected the adequacy of defense counsel's representation. The state
26   supreme court's rejection of the claim thus was neither contrary to nor an unreasonable
application of federal law regardless of whether the representation is viewed as
27   concurrent rather than successive.

28   [39]*See* text and record cites, *supra*, at 11-12.

plea bargain presented.[40]  He maintains that an attorney with undivided loyalties would not have presented him with a plea deal that was "blind" rather than binding because he remained exposed to a possible sentence of life without the possibility of parole at sentencing.  In the same vein, he maintains that conflict-free counsel never would have agreed to the State concurring in the recommendation of probation and parole, as he then would be agreeing to the State concurring in a recommendation of life without the possibility of parole if the department made such a recommendation (which it did not). Petitioner asserts that the dropping of the weapon enhancement pursuant to the plea bargain was "moot" pursuant to the deal if he thereafter was sentenced to life without the possibility of parole.  He asserts that an agreement to also drop a charge on a drive-by shooting incident was "laughable" and "just fluff" because he already had a deal in place precluding pursuit of that charge.  Petitioner concludes with the assertion that if counsel had been free of conflict and advocating on his behalf "I would not have signed such an insane agreement and would have insisted on going to trial."[41]

Petitioner in essence appends to a list of features of the plea deal with which he now is dissatisfied a conclusory assertion that "an attorney with undivided loyalties" would have obtained a better plea deal. That bald supposition does not constitute a showing that an alleged conflict actually adversely affected the adequacy of counsel's representation. Otherwise, a defendant or petitioner could establish a Sixth Amendment violation merely by conclusorily asserting that the "outcome would have been different" if counsel had not allegedly had a conflict of interest.  Petitioner has made no showing that — at the time of negotiation of the plea bargain in December 2006 — his defense

_____

[40]The Court simply will assume that petitioner's allegations, which were not presented in the state courts, do not render the claim unexhausted and/or do not implicate the rule in *Cullen v. Pinholster*, 131 S.Ct. 1388 (2011), that federal review under AEDPA is limited to the record presented to the state courts.  As discussed in the text, petitioner's argument is completely without merit, whether on *de novo* or deferential review.

[41]Dkt. no. 5, at 6-7.  Petitioner has retained counsel on federal habeas review, but he has elected to not seek to file a counseled amended petition.

counsel, Carl Anderson, proceeded differently than he would have otherwise because another lawyer in the public defender's office located in another town had represented his co-defendant in an unrelated juvenile matter earlier in 2006 and of which Anderson was not aware. Petitioner provides no cogent explanation as to how the prior representation would have caused Anderson to have divided loyalties — in actual fact, not in bald theoretical supposition — where his negotiation of the plea agreement would have been adversely affected by a motivation to instead pursue competing and contradictory interests of the co-defendant Andrews.[42] Simply urging that "I would have received a better plea deal" with an attorney without the alleged conflict does not establish a Sixth Amendment violation.[43]

Petitioner otherwise has not established that the state court decision rejecting his claim was based upon an unreasonable determination of fact based on the state court record.

_____

[42]Again, no evidence at the state evidentiary hearing was presented that Carl Anderson — as opposed to another attorney at some unspecified time — was even aware of the other representation, at the time of the plea or otherwise. *See* text, *supra*, at 12-13.  But even if it were assumed that Anderson, not some other lawyer at some other point in time, in fact was aware of the unrelated juvenile representation at the time of the plea, petitioner has not established how that knowledge would have actually adversely affected Anderson's handling of the murder case and guilty plea.

[43]Petitioner additionally contends that an alleged conflict actually adversely affected the adequacy of counsel's performance because an attorney with undivided loyalty would have secured the suppression of his "so-called admission." Dkt. no. 5, at 6.  It is not entirely clear what admission Hutchinson maintains was subject to suppression.  None of the inculpatory statements made by Hutchinson that were discussed in the factual background herein would appear on their face to have been subject to suppression. In all events, merely baldly positing that an attorney without the alleged conflict would have obtained a better result on one issue or another does not carry petitioner's burden under *Mickens*. Petitioner has not shown how the unrelated juvenile representation by another public defender earlier in 2006 caused his defense counsel to not seek to suppress Hutchinson's statements, much less how such suppression would have materially changed the decision facing petitioner in the plea negotiations. The State had ample evidence establishing that Hutchinson murdered George Moritz, including the testimony of multiple eyewitnesses who knew and recognized Hutchinson, that he shot Moritz in the head in an unprovoked attack. Petitioner's bald supposition that an attorney not subject to an alleged conflict would have suppressed any inculpatory post-arrest statements and secured a better plea bargain essentially ignores the compelling evidence of guilt that Hutchinson faced in a trial.  His plea deal reflected the evidence against him.

23

Petitioner maintains that the state district court erroneously found that the juvenile proceeding had been finalized in May 2006. He urges that erasing this alleged fallacy would change the entire context of the decision. However, as discussed previously herein, such a finding would not necessarily constitute an unreasonable determination of fact.[44] Further, as also discussed previously, the factual point simply is not determinative under the Sixth Amendment on federal habeas review.[45] Regardless of whether or not the juvenile proceedings had been finalized prior to the substitution of retained counsel in June 2006 (six months before Hutchinson's guilty plea), the most salient point is that petitioner failed to demonstrate at the state evidentiary hearing that such representation — regardless of the temporal extent to which it was concurrent or successive — actually adversely affected the adequacy of counsel's representation in the murder case. Under clearly established Supreme Court precedent, the mere fact of multiple concurrent representation, standing alone, does not establish an actual conflict for purposes of the Sixth Amendment. *Mickens, supra.* Petitioner essentially proceeds on the assumption that he need show only the fact of multiple concurrent representation to carry the day. That is not the law.

Petitioner further maintains that the state courts made a factual error in some sense because when he stated at the plea colloquy that he was not aware of anything that his counsel could have done more or better he was not aware of the alleged conflict. This point also has no bearing on the outcome on federal habeas review. The outcome in this matter turns upon whether petitioner demonstrated in the state courts that the alleged conflict actually adversely affected the adequacy of defense counsel's representation. He did not do so. Petitioner's learning of an alleged conflict that later has not been demonstrated to have actually adversely affected defense counsel's

///

---

[44]See text, *supra,* at 20 n.38, and text and record cites, *supra,* at 9 n.24.

[45]See text, *supra,* at 20 n.38.

24

1   representation at the time does not in any sense undermine either the voluntariness of

2   his guilty plea or the state courts' rejection of his Sixth Amendment claim.[46]

3          The sole claim presented accordingly does not provide a basis for federal habeas

4   relief.

5   **IV.   CONCLUSION**

6          IT IS THEREFORE ORDERED that the petition shall be DISMISSED with

7   prejudice on the merits.

8          IT IS FURTHER ORDERED that a certificate of appealability is DENIED.  Jurists

9   of reason would not find the district court's dismissal of the petition to be debatable or

10  wrong, for the reasons discussed herein.  Petitioner was convicted pursuant to a guilty

11  plea of a first-degree murder committed on March 27, 2006.  He was represented by an

12  attorney with the public defender beginning on June 1, 2006.  He alleges herein that he

13  was denied effective assistance of counsel in violation of the Sixth Amendment because

14  another attorney with the public defender from another location was counsel of record

15  for his co-defendant in an unrelated juvenile proceeding up through a June 20, 2006,

16  order substituting retained counsel in that proceeding. Regardless of whether or not the

17  juvenile proceeding effectively had been adjudicated prior to the murder, petitioner did

18  not demonstrate at the state court evidentiary hearing that the public defender's

19  representation in the juvenile proceeding actually adversely affected the adequacy of

20

21          [46]Petitioner additionally challenges a statement in the state district court's
22  findings that an amendment of the state petition was sought, was not opposed by the
    State, and was granted.  He urges that no such amendment was sought, unopposed, or
23  granted. Petitioner quite clearly changed the factual basis for his Sixth Amendment
    claim between his counseled state post-conviction submission and the state court
24  evidentiary hearing.  Petitioner urged in the counseled submission that defense counsel
    had represented the co-defendant in the murder case itself.  Petitioner was allowed to
25  instead argue at the evidentiary hearing that the juvenile representation was the basis
    for the alleged conflict. See #27, at 8-10.  If petitioner would prefer to be limited on both
26  state and federal post-conviction review to the prior factually erroneous claim of a
    conflict based on mutual representation in the criminal case, judgment then can be
27  entered denying the federal petition as being based upon an entirely false factual
    premise.  Further to the point, petitioner cannot obtain federal habeas relief based on an
28  alleged factual inaccuracy in a state court procedural recital on such collateral minutiae.
    It takes far more than such a quibble to overturn a state court judgment of conviction.

his trial counsel's representation in the murder case in connection with his December 2006 guilty plea. At the state court hearing, petitioner relied in argument upon a purported presumption of prejudice that is not supported by the controlling Supreme Court precedent. *Mickens, supra.*[47]  On federal habeas review, petitioner simply posits that he would have obtained a better plea deal in a number of particulars if he instead had been represented by counsel with "undivided loyalties." The underlying premise of petitioner's claim essentially is that a Sixth Amendment violation is established whenever multiple representation occurs, because counsel then is inherently subject to divided loyalties.  However, under the controlling law, a petitioner must show not merely a theoretical division of loyalties but instead that the multiple representations actually adversely affected the adequacy of counsel's representation. Petitioner failed to do so at the state court evidentiary hearing, and his claim on federal habeas review essentially is based on the bald supposition that he would have been able to obtain a better plea bargain if he had been represented by counsel not subject to the alleged conflict.  A certificate of appealability therefore is denied, as jurists of reason would not find the rejection of the petition to be debatable or wrong.

The Clerk of Court shall enter final judgment accordingly, in favor of respondents and against petitioner, dismissing this action with prejudice.

DATED THIS 9th day of August 2013.

MIRANDA M. DU
UNITED STATES DISTRICT JUDGE

---

[47]Equivocal testimony by an appellate division public defender did not establish that a Sixth Amendment violation occurred under the applicable standard, as discussed in the text herein.